158 N.J. Super. 241 (1978)
385 A.2d 1244
MONMOUTH MEDICAL CENTER, A NONPROFIT CORPORATION OF THE STATE OF NEW JERSEY, APPELLANT,
v.
STATE OF NEW JERSEY; ANN KLEIN, COMMISSIONER OF INSTITUTIONS AND AGENCIES OF THE STATE OF NEW JERSEY; GERALD J. REILLY, DIRECTOR OF THE DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES OF THE STATE OF NEW JERSEY, RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 14, 1977.
Decided March 27, 1978.
*244 Before Judges MATTHEWS, CRANE and ANTELL.
Mr. Frank R. Ciesla argued the cause for appellant (Messrs. Giordano, Halleran & Crahay, attorneys).
Ms. Andrea M. Silkowitz, Deputy Attorney General, argued the cause for respondents (Mr. William F. Hyland, Attorney General of New Jersey, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
Monmouth Medical Center (claimant), a provider of in-patient hospital services under the New Jersey Medical Assistance and Health Services Program (Medicaid), N.J.S.A. 30:4D-1 et seq., appeals from a final decision of the Director of the Division of Medical Assistance and Health Services modifying in part the decision of the program fiscal intermediary, Prudential Insurance Company of America (Prudential), to deny in part the payment of claims submitted by claimant for services provided to three Medicaid recipients, Luther Townsend, James Remkowski and Madeline B. Papikas. (A fourth recipient's claim is not challenged on this appeal).
Monmouth Medical Center is a nonprofit hospital located in Long Branch, Monmouth County. It entered into an agreement with the former Department of Institutions and Agencies to provide medically necessary inpatient services to persons deemed eligible to receive benefits under the Medicaid program, and agreed to "abide by the rules and regulations" of the program. N.J.A.C. 10:52-1.1(1)(iv). The *245 controversy before us arises because of the Director's insistence that under the agreement claimant is bound by the express provisions of N.J.A.C. 10:52-1.2(a)(18)(Note), (b)(1), which literally preclude reimbursement for inpatient hospital services provided while a patient awaits placement in a skilled nursing facility or intermediate care facility.
Originally Prudential, as agent of the Department of Institutions and Agencies for the purposes of reviewing claims submitted by providers under the Medicaid program, denied coverage for portions of the periods during which the named individuals were patients and receiving care at the Monmouth Medical Center. In each instance claimant requested a fair hearing before the Division. Thereafter, a full hearing on each case was held before a hearing officer, who recommended the claimant be reimbursed for the payment periods which had been denied by Prudential. The Director rejected the hearing officer's recommendation in the Townsend case and denied payment for the period in question, and he modified the hearing officer's recommendations in the Papikas and Rempkowski cases, allowing payments for part of the disputed periods.
The following constitute brief summaries of the basic facts surrounding the hospitalization of the three patients whose cases precipitated these proceedings.
Luther Townsend, a Medicaid recipient with a history of alcoholism and chronic epilepsy, was hospitalized from April 7, 1975 to May 28, 1975 with a broken hip. Surgery was performed on April 15, 1975. Sometime after April 9, 1975 claimant's Social Services Department worker began a search for a nursing home that would accept a patient with Townsend's disabilities and whose only source of funds was Medicaid. On May 28, 1975 a bed was finally found in a home in Cliffwood Beach, Monmouth County. It is undisputed that there was no hesitation or delay on the part of the attending physician, or the Social Services Department in placing Townsend in any nursing home that would accept him. *246 However, Prudential and the Director determined that further inpatient hospital stay was not medically necessary beyond May 8, 1975. In addition, it was the Director's decision that, since § 202.9 of the Hospital Services Manual (N.J.A.C. 10:52-1.2(a) 18 Note, (b)1), provides that payment for special circumstances is specifically precluded for patients awaiting placement in a skilled nursing facility or intermediate care facility, the denial of payments to Townsend was justified, even though through no fault of his own or that of his provider he was not able to be discharged until May 29, 1975. It is conceded by the Division that Townsend required medical attention beyond May 8, 1975 but that such attention should have been given in a lesser care facility. In reinstating Prudential's decision, the Director denied claimant reimbursement for 19 days at a cost of $2,827.39.
In the case of Madeline Papikas, hospital services were rendered from June 1, 1974 to December 10, 1974. The Director determined that her inpatient hospital stay was not medically necessary beyond September 1, 1974. Accordingly, 99 days of hospitalization were rejected. Mrs. Papikas' case involved a series of bureaucratic delays by government agencies in approving her Medicaid coverage which made it initially impossible to place her in a lower level care facility. By the time the delays were resolved on December 5, 1974 the patient had recovered to the point where she could be released. It is conceded that Mrs. Papikas required medical attention and that Monmouth Medical Center was the only facility then available to render the needed care.
The period of time involved in the case of James Rempkowski extended from November 23, 1975 to March 9, 1976. The patient required intensive medical care from November 11, 1975 to January 13, 1976. The Utilization Review Committee in essence agreed with Prudential's determination that there was a decrease in the medical necessity for acute bed care at that time. However, as in the Papikas case, there were again eligibility problems. Eligibility was cleared *247 on February 19, 1976, and the patient's Medicaid number was received on February 21, 1976. The patient was discharged and admitted to Bayview Convalescent Center on March 9, 1976, as he had already been placed on the waiting list. Prudential denied payment for January 13, 1976 to March 9, 1976. The Director again modified the hearing officer's recommendation and allowed payment up to and including February 19, 1976, as the effective date of eligibility. However, he determined that no payment be made beyond the above date because Regulation 202.9, referred to above, precluded payment for patients awaiting nursing home placement.
In each case the Director found that medical necessity is based on where needed care is obtained and not on whether the care is in fact necessary for the well-being of the patient.
It is undisputed that it would have been negligent for claimant to have discharged any of these patients to anything but a skilled nursing care facility on the respective dates that hospital care was no longer required.

I
Title XIX of the Social Security Act, 42 U.S.C.A. § 1396 et seq., establishes a Medical Assistance Program under which participating states may provide federally-funded medical assistance to needy persons. Title XIX establishes two groups of needy persons: (1) the "categorically" needy, which includes needy persons with dependent children, and the aged, blind, and disabled, 42 U.S.C.A. § 1396a(a) (10)(A), and (2) the "medically" needy, which includes persons financially ineligible for AFDC or SSI benefits, 42 U.S.C.A. § 1396a(a)(10)(C). Participating states are not required to extend Medicaid coverage to the "medically" needy, and New Jersey has chosen not to do so (N.J.S.A. 30:4D-3(f)). The federal statute requires participating states to provide qualified individuals with financial assistance in five general categories of medical treatment (including inpatient *248 hospital services). 42 U.S.C.A. §§ 1396a(a) (13) (B), 1396a(a) (1)-(5).
Although Title XIX does not require states to provide funding for all medical treatment falling within the five categories, it does require that state Medicaid plans establish "reasonable standards * * * for determining * * * the extent of medical assistance under the plan which * * * are consistent with the objectives of [Title XIX]." 42 U.S.C.A. § 1396a(a) (17). Beal v. Doe, 432 U.S. 438, 441, 97 S.Ct. 2366, 2369, 53 L.Ed. 2d 464, 470 (1977).
Sections 202 and 202.9 of the Hospital Services Manual, derived from N.J.A.C. 10:52-1.2(a)(18) Note, (b)(1) state:

202. Non-Covered Inpatient Services

Benefits are not payable for any services rendered or items dispensed or furnished in connection with:

* * * * * * * *

202.9 Services Rendered After Day Medically Necessary

Inpatient hospital services rendered after the day it is medically necessary, except when special circumstances prevent the discharge or transfer of the patient.
Note: The Contractors may reimburse a hospital up to 12 calendar days following the period established medically necessary if special circumstances (social necessity) prevent the discharge or transfer of the patient to his/her home or sheltered boarding home and the hospital has taken effective action to stimulate placement of the patient.
Effective action is defined as telephone notification to the County Welfare Board, Division of Youth and Family Service District Office or other responsible officials within one working day of the time that the stay has been determined to be no longer medically necessary. This telephone contact must be then confirmed in writing.
A copy of the written notification must be submitted with all claims for which reimbursement is claimed for special circumstances (social necessity).

* * * * * * * *
Payment for special circumstances (social necessity) is specifically precluded for:
(a) Patients awaiting placement in a Skilled Nursing Facility or Intermediate Care Facility.
(b) Patients for whom a claim has been denied for lack of medical necessity.
*249 (c) Patients who were not eligible recipients as of the date of admission.
It is this regulation which claimant contends violates federal Medicaid law and Regulations if it is read literally so as to foreclose the exercise of discretion in its application.
The language of Title XIX confers broad discretion on the State to adopt standards for determining the extent of medical assistance, requiring only that such standards be "reasonable" and "`consistent with the objectives' of the Act." Beal v. Doe, above, 432 U.S. at 444, 97 S.Ct. at 2371, 53 L.Ed. at 472. Participation by this State in the program was authorized by the enactment of the New Jersey Medical Assistance and Health Services Act, N.J.S.A. 30:4D-1 et seq.
The stated purpose of the act was to provide medical assistance, insofar as practicable, on behalf of persons whose resources were determined to be inadequate to enable them to secure quality medical care at their own expense, and to enable the State, within the limits of funds available for any fiscal year for such purposes, to obtain all benefits for medical assistance provided by the Social Security Act. N.J.S.A. 30:4D-2. [N.J. Fed'n of Physicians and Dentists v. Klein, 144 N.J. Super. 467, 470 (App. Div. 1976).]
There is no doubt, therefore, that the Department has the power to adopt reasonable rules and regulations which are necessary to carry out its functions under N.J.S.A. 30:4D-7 and its federal counterpart, 42 U.S.C.A. § 1396 et seq. In re Fair Hearing, 138 N.J. Super. 417, 422 (App. Div. 1976).
There is no dispute here with respect to the patients' eligibility for Medicaid assistance, the services rendered or the amount of each claim. The only dispute is whether Regulation 202.9, as construed by the Director, is in violation of federal requirements that call for reimbursement of all reasonably necessary inpatient hospital services.
A state plan must provide for "payment of the reasonable cost of inpatient hospital services provided under the *250 plan." 42 U.S.C.A. § 1396a(a) (13) (D). Inpatient hospital services are those "services ordinarily furnished by the hospital for the care and treatment of inpatients provided under the direction of a physician * * *." 42 C.F.R. § 249.10(a) (1) (6) (i). The state plan must:
[S]pecify the amount and/or duration of each item of medical and remedial care and services that will be provided to the categorically needy and to the medically needy, if the plan includes this latter group. Such items must be sufficient in amount, duration and scope to reasonably achieve their purpose with respect to the required services * * *. The state may not arbitrarily deny or reduce the amount, duration or scope of such services to an otherwise eligible individual solely because of the diagnosis, type of illness or condition. Appropriate limits may be placed on services based on such criteria as medical necessity of those contained in utilization or medical review procedures. [42 C.F.R. § 249.10(a)(G)(i)]
The test under the regulation is one of reasonableness: does the state Plan provide services sufficient to "reasonably achieve their purpose?" Virginia Hospital Ass'n v. Kenley, 427 F. Supp. 781, 785 (E.D. Va. 1977).
In Commonwealth Dept. of Public Welfare v. Temple Univ., etc., 21 Pa. Cmwlth. 162, 343 A.2d 701 (Cmwlth. Ct. 1975), the issue was raised as to whether it was an abuse of administrative discretion to deny reimbursement to hospitals which have diligently put forth every effort to locate, without success, an appropriate lesser care facility or a competent relative to accept the patient. In finding that discretion should be exercised, the Commonwealth Court noted:
* * * In misutilization cases such as this where a patient may no longer be in need of continued acute hospital care but does need some lower level care, we believe that it would be an abuse of administrative discretion to deny reimbursement to hospitals which have diligently put forth every effort to locate, without success, an appropriate lesser care facility or a competent relative for the patient. In such circumstances there is still a medical necessity for the hospital services. To hold otherwise would be to read penalty provisions into the regulations where the culpability of the hospital for the *251 particular misutilization involved cannot be established. * * * [343 A.2d at 704; emphasis supplied]
See also, Dep't of Public Welfare v. Frankford Hosp., 26 Pa. Cmwlth. 484, 364 A.2d 957 (Cmwlth. Ct. 1976); St. Christopher's Hospital v. Commonwealth, 30 Pa. Cmwlth. 88, 372 A.2d 504 (Cmwlth. Ct. 1977). In Temple the court was dealing with a regulation which permitted the exercise of some administrative discretion based on medical necessity (Pa. Manual § 9421.532b.), whereas here the regulation under review, read literally, seems to preclude reimbursement for any period that a patient is awaiting placement to a lesser care facility. We note, however, that our regulation is silent as to reimbursement during a period of the unavailability of a lesser care facility. The federal statute, 42 U.S.C.A. 1396 et seq., does not mention the eligibility of inpatient services for those awaiting placement; payments are allowed, we note, for care in nursing facilities. 42 U.S.C.A. 1396a(a)(13)(E).
The Director advises us that the policy inherent in a literal interpretation of the regulation questioned here is not to provide a penalty but to discourage "overutilization" of hospital services, and is rationally related to this State's legitimate interest in maintaining the fiscal solvency of the program.
The Director, relying on judicial approval of statutory limitation on inpatient hospital coverage in Virginia Hosp. Ass'n v. Kenley, 427 F. Supp. 781 (E.D. Va. 1977), and Commonwealth, Dep't of Public Welfare v. Temple Univ., etc., 21 Pa. Cmwlth. 162, 343 A.2d 701, (Cmwlth. Ct. 1975), argues that this State properly precludes the reimbursement sought by claimant here. We cannot accept that argument. We disagree with the Virginia case in which the court gave a highly literal construction to the phrase "under the plan" as used in 42 U.S.C.A. § 1396a(a) (13) (D). The phrase should not be read alone but in the context of the option granted to the several states to provide coverage *252 to "medically needy" as well as "categorically needy." See 45 C.F.R. § 248.10(a). And while the Pennsylvania case does sanction the 60-day limitation to patient hospital care for the categorically needy as provided by the Commonwealth statute, that case also, as noted heretofore, directed reimbursement to the hospital for care of a patient awaiting placement to a lesser care facility.
The Director also contends that because claimant, by becoming a provider of Medicaid services, has voluntarily agreed to be bound by the regulations promulgated by him, absent a showing of "coercion, duress, impossibility of performance of, or total absence of statutory authority for this condition of participation," we are without power to alter the terms of that agreement, citing Briarcliff Haven, Inc. v. Dep't of Human Resources, Ga., 403 F. Supp. 1355 (N.D. Ga. 1975). The difficulty with this argument is that it presupposes that the Director's construction of the questioned regulation accords with the statutory purpose expressed by Congress. In addition, we find the Briarcliff case to be inapposite since it dealt with maximum reimbursement ceilings established by the Georgia Department of Human Resources for payment for nursing home services.
Unlike the Virginia, Georgia and Pennsylvania regulations referred to in Kenley, Briarcliff Manor and Temple, above, however, New Jersey fixes no maximum limit to hospital service which is found to be medically necessary for a qualified patient. The record here establishes that in all three cases under review it was found to be medically necessary to retain the patients under hospital care because no available lesser care facility could be found. That conclusion is not undermined by the fact, undisputed by the Director, that New Jersey is presently experiencing a critical Medicaid nursing home bed shortage, since the primary object of our program is adequate patient care which is found to be medically necessary.
The federal concept of medical necessity is found most clearly defined in those cases dealing with Medicare legislation. *253 42 U.S.C.A. § 1395 et seq. Those cases uniformly hold that an individual who is eligible for extended care coverage does not lose coverage under the act during a period that he is forced to remain in a general hospital for treatment for the sole reason that there is no available extended care facility available to take him. In Hayner v. Weinberger, 382 F. Supp. 762 (E.D.N.Y. 1974), the patient was denied benefits under § 1395y(a) (9) of the act because she remained in a hospital when only an extended care facility was required; however, no such facility was available, and it was conceded that the patient, an 83-year-old woman with terminal cancer, could not be discharged except to an extended care facility. The court, in reversing the denial of benefits by the Secretary of Health, Education and Welfare, concluded on the theory of "impossibility of performance" and on the facts of the case:
In determining whether to grant reimbursement in this case we begin with the axiom that "[t]he congressional policy underlying the federal social security legislation requires the courts to interpret the Act liberally, and any doubts should be resolved in favor of coverage." * * * The Act should be construed to effectuate its overriding purpose even if the words used leave room for a contrary interpretation. * * * By providing under 42 U.S.C.A. § 1395f(a) (2) (C) for coverage of treatment in extended care facilities, it seems to us that Congress intended to provide needed treatment to patients who otherwise would be compelled to remain in a general hospital. * * * It would be anomalous to say that Congress intended to leave a gap in coverage for a patient who is lying on her back in a general hospital and who, through no fault of her own, could not immediately obtain extended care treatment elsewhere and at the same time provide such coverage if she could have obtained such treatment in another facility. We believe that such a denial of coverage would not only be harsh and unjust but also would not comport with the spirit of the Act. [382 F. Supp. at 765; citations omitted; emphasis supplied]
See also, Hultzman v. Weinberger, 495 F.2d 1276 (3 Cir.1974); Torphy v. Weinberger, 384 F. Supp. 1117 (E.D. Wis. 1974).
*254 The Director's argument that the Medicare cases are not applicable in the Medicaid context raises a distinction without any real difference. The Medicare legislation, like the Medicaid legislation, seeks to encourage the efficient and economical use of medical facilities. Both have as their goal the availability of services medically necessary for patients eligible under the respective acts. The controlling factor is not where the service or treatment is performed but whether it is medically necessary. Under this factor there can be no "misutilization" if no lesser care facility is available.
There is nothing in the record here which would support the conclusion that the services rendered to the three patients involved were not medically reasonable and necessary. What evidence there is points to the contrary. And, as noted, the hearing officer concluded that the services were needed in each of the cases.
Accordingly, we conclude that the Director erroneously interpreted the applicable regulation (Hospital Services Manual §§ 202.9 Note; N.J.A.C. 10:52-1.2(a) (18) Note, (b)(1)) so as to exclude any exercise of discretion in circumstances such as those presented by the cases of the three patients in question. Such discretion should be exercised when the provider (who has the burden) can demonstrate the medical necessity for the treatment or services provided to the patient, the need for a release of the patient only to a lesser care facility, the efforts made by it to place the patient in such facility, and the unavailability of the required facility.

II
Claimant also argues that due process mandates a predetermination hearing be held before any Medicaid recipient, such as each whose case is involved here, is cut off from the receipt of benefits. The Director contends that claimant has no standing to raise this issue. We disagree. *255 Claimant, as a Medicaid provider, is a party directly affected by the nonreimbursement of the benefits in question. N.J.S.A. 30:4D-7(f) specifically provides "that either the recipient or the provider shall be afforded the opportunity for a fair hearing within a reasonable time on any valid complaint." Furthermore, N.J.A.C. 10:49-1.13 requires that "all providers of service or covered persons will be given the opportunity for a fair hearing concerning grievances arising from the claims payment process." The Plaintiff's rights in the process are to be considered in conjunction with the recipients: it is the provider that is injured when reimbursement is denied, not the recipient. See, e.g., Rosado v. Wyman, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970); Singleton v. Wulff, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed. 826 (1976); Massachusetts General Hosp. v. Sargent, 397 F. Supp. 1056, 1059 (D. Mass. 1975); Nat'l U. of Hosp. & Health Care Emp., etc. v. Carey, 557 F.2d 278, 280-281 (2 Cir.1977). In Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970), the court established the test to determine when a predetermination hearing must be held prior to the effectiveness of an administrative order:
The extent to which procedural due process must be afforded the recipient is influenced by the extent to which he "may be condemned to suffer grievous loss," * * * and depends upon whether the recipient's interest in avoiding that loss outweighs the governmental interest in summary adjudication. [397 U.S. at 262-263, 90 S.Ct. at 1018]
Goldberg involved the termination of welfare benefits without a predetermination hearing. The court concluded that when welfare is discontinued, only a predetermination evidentiary hearing provides the recipient with procedural due process since
* * * termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. * * * His need to concentrate upon *256 finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy. [at 264, 90 S.Ct. at 1019]
The decision whether a predetermination hearing is necessary depends on the balancing factors peculiar to the litigation. The post-determination here involved would not leave recipients "destitute," unlike the situation presented in Goldberg. A denial of an inpatient hospital claim and subsequent proceedings by the hospital against the recipient will not result in a total loss of subsistence or a further loss of medical benefits.
Providers, such as claimant, are aware of rules and regulations set forth by the plan, which they are required to follow. They are not completely without notice as to the services that may be offered. Claimant was entitled to and received a fair hearing as to termination of benefits followed by an appeal. Accordingly, the right to be heard "at a meaningful time and in a meaningful manner," Armstrong v. Manzo, 380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed.2d 62 (1965), is satisfied by the provision for a post-denial hearing on behalf of the recipient where he seeks to challenge the determination. Compare Mercy General Hosp. v. Weinberger, 410 F. Supp. 344 (E.D. Mich. 1975).
The determinations of the Director of the Division of Medical Assistance and Health Services, insofar as it denies reimbursement to claimant for the waiting periods mentioned herein, are reversed.