MONMOUTH MEDICAL CENTER, A NON-PROFIT CORPORATION OF THE STATE OF NEW JERSEY, RESPONDENT-CROSS-APPELLANT, v. STATE OF NEW JERSEY; ANN KLEIN, COMMISSIONER OF INSTITUTIONS AND AGENCIES OF THE STATE OF NEW JERSEY; GERALD J. REILLY, DIRECTOR OF THE DIVISION OF MEDICAL ASSISTANCE AND HEALTH SERVICES OF THE STATE OF NEW JERSEY, APPELLANTS-CROSS-RESPONDENTS.

Argued February 21, 1979—Decided June 18, 1979.

300

Ms. *Andrea M. Silkowitz,* Deputy Attorney General, argued the cause for appellants (*Mr. John J. Degnan,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel).

Mr. *Frank R. Ciesla* argued the cause for respondent (*Messrs. Giordano, Halleran and Crahay,* attorneys; *Mr. Ciesla* and *Mr. Phil H. Leone,* on the briefs).

The opinion of the court was delivered by

PASHMAN, J. The primary issue presented in this case is whether a State may, consistent with the Federal Medicaid Act, 42 *U. S. C.* § 1396 *et seq.,* and its accompanying regulations, 42 *C. F. R.* § 430 *et seq.* (1978), deny reimbursement to a hospital for medically necessary services rendered to an eligible patient who can be adequately treated in a less intensive care facility but who, through no fault of the

hospital, cannot be suitably placed. Specifically, we must determine the validity, as applied to the facts of this case, of a State regulation which denies recompense to a hospital for inpatient services provided to a Medicaid recipient awaiting placement in a skilled nursing home or intermediate care facility. We are further asked to consider whether the review process utilized by the Division of Medical Assistance and Health Services (Division) in order to determine the merits of a hospital's objections concerning denials of reimbursement comports with the requirements of procedural due process.

For the reasons given below, we conclude that the hearing procedure survives constitutional scrutiny, but that nonetheless the challenged reimbursement regulation is inconsistent with the Federal Act and hence invalid under the Supremacy Clause of the United States Constitution. *U. S. Const.*, Art. 6.

Medicaid is a program whose principal aim is that of "enabling each State, as far as practicable under the conditions in such State, to furnish * * * medical assistance [to] individuals whose income and resources are insufficient to meet the costs of necessary medical services * * *." 42 *U. S. C.* § 1396. In order to achieve this goal, a complex cost-sharing mechanism has been constructed providing for partial federal funding of medical services rendered to the indigent.[1]

The Medicaid Act represents an exercise in what has been termed "cooperative federalism." Note, "State Restrictions on Medicaid Coverage of Medically Necessary Services," 78 *Colum. L. Rev.* 1491, 1491 (1978). The program is primarily administered by the State, subject to federal guidelines and constraints. Each participating State is required to

---

[1]The percentage of Medicaid expenses defrayed by the federal government ranges from 50% to 83-1/3%. *See* 42 *U. S. C.* §§ 1396b; 1396d(b); 1301(a)(8)(B). New Jersey's federal share amounts to 50%.

adopt a plan, which must be approved by the Secretary of the Department of Health, Education & Welfare (HEW), covering in detail the services to be rendered. 42 *U. S. C.* §§ 1396, 1396a(a). The plan must provide for five general categories of medical assistance and may include others.[2] 42 *U. S. C.* 1396a(a)(13)(B). Reimbursement must be provided for "the reasonable cost of inpatient hospital services," *id.* §1396a(a)(13)(D), and "skilled nursing facility and intermediate care facility services * * * on a reasonable cost related basis * * *." *Id.* § 1396a(a)(13)(E).

Plaintiff Monmouth Medical Center (Monmouth), a non-profit hospital situated in Long Branch, has contracted with the State to be a provider of medical services to eligible recipients pursuant to the State Medicaid Program. *N. J. S. A.* 30:4D–1 *et seq.* Under this agreement Monmouth is obligated to provide medically necessary inpatient services to the "categorically needy." This group consists of

> . . . all individuals receiving aid or assistance under any plan of the State approved under subchapter I [Old Age Assistance], X [Aid to the Blind], XIV [Aid to the Disabled], or XVI [Supplemental Security Income], or part A of subchapter IV [Aid to Families with Dependent Children] of this chapter, or with respect to whom supplemental security income benefits are being paid under subchapter XVI of this chapter[.]
>
> [42 *U. S. C.* § 1396a(a)(10)(A)][3]

---

[2]The mandatory coverage areas are: (1) inpatient hospital services; (2) outpatient hospital services; (3) other laboratory and x-ray services; (4) skilled nursing facilities, early and periodic screening, and diagnosis and family planning services; and (5) physicians services. 42 *U. S. C.* § 1396d(a)(1–5). Optional coverage categories include: (1) home health care services; (2) private duty nursing services; (3) clinical services; (4) dental services; (5) physical therapy; and (6) intermediate care facility services. 42 *U. S. C.* § 1396d(a)(7)–(11), (15).

[3]State plans must provide for the rendition of medical assistance to this group. Optional coverage may be extended to the "medically needy" — those who do not qualify for public assistance yet lack

In return, Monmouth is entitled to reimbursement by the State for certain expenses incurred in treating these patients.

The present controversy originated when Prudential Insurance Company of America, an underwriter of the State's program,[4] denied in part three reimbursement claims submitted by Monmouth.[5] Pursuant to *N. J. S. A.* 30 :4D–7 (f) *and N. J. A. C.* 10 :49–1.16, Monmouth requested a "fair hearing" before the Division to challenge the validity of Prudential's actions. On August 13, 1976 a consolidated proceeding was held before a Division Hearing Officer.

The first reimbursement claim involved services rendered to one Luther Townsend, a 55-year-old male who was hospitalized from April 7 to May 28, 1975 due to a fractured hip. Dr. James Gardam, Prudential's representative, testified that as of April 23, 1975 the medical charts indicated that Mr. Townsend was convalescing satisfactorily. Although Prudential agreed that Townsend's condition necessitated physiotherapy and thus skilled nursing services, it contended that after May 8, 1975 there was no medical need for hospitalization. Prudential therefore denied reimbursement for services rendered after May 8 on the basis that less intensive — and less expensive — care was feasible.

Dr. James Kirby, Chairman of the Monmouth Medical Center Utilization Review Committee, agreed with Dr. Gardam that Townsend could have been adequately treated in a lesser care facility after May 8. He asserted, however, that Monmouth had been unable to place Mr. Townsend in a suit-

sufficient "income and resources to meet the costs of necessary medical and remedial care and services. * * *" 42 *U. S. C.* § 1396a (a) (10) (C). New Jersey has chosen to give Medicaid relief only to the "categorically needy."

[4] Statutory authorization for such "fiscal intermediaries" is found in *N. J. S. A.* 30 :4D–8. Rules governing their selection appear at *N. J. S. A.* 30 :4D–9 through –11.

[5] A fourth claim was also denied, but it is not involved in this appeal and hence will not be discussed.

able institution and that the hospital would have been negligent had it merely released the patient to fend for himself.

Mrs. Cunningham, the Coordinator of Social Services at Monmouth, testified that beginning April 9, 1975 attempts were made to place Mr. Townsend in a nursing home or intermediate care facility. The hospital canvassed all such facilities in Monmouth and Ocean Counties on a daily basis. It was not until May 28 that a bed became available and therefore Townsend was not discharged until that date. Mrs. Cunningham further explained that the hospital did not contact institutions in other counties because it was already aware that they had no available space.

The second case involved Madeline Papikas, a 47-year-old female admitted on April 9, 1974 due to kidney and liver failures. The seriousness of her condition necessitated a lengthy hospital stay. As of September 1, 1974, however, her medical chart revealed that she was sufficiently stabilized for transfer to a lesser care facility. Nevertheless, due to an unfortunate morass of bureaucratic red tape, Monmouth was unable to obtain a Medicaid number for Mrs. Papikas despite diligent efforts on its part.[6] Without such a number, no nursing home would accept her as a patient. By the time a number was finally procured, December 5, 1974, nursing home care was no longer necessary. Accordingly, Monmouth's Social Services Unit obtained an apartment for Mrs. Papikas and on December 10, 1974 she was discharged.

Both sides agreed that Mrs. Papikas needed medical attention even after September 1 — the date after which Prudential refused to reimburse Monmouth — but that nursing home care would have been adequate. They further stipulated

---

[6]The record reveals that local, state and federal agencies were all approached in an effort to expedite matters. Apparently the difficulty arose because the agencies could not obtain an address for Mrs. Papikas, her landlord having rented out her room after she was admitted to the hospital.

that it would have been negligent for Monmouth to have merely released her at that time.

The final case was that of James Rempkowski who was hospitalized from November 23, 1975 through March 9, 1976 due to a cardiac arrest and resultant brain damage. Although a lengthy period of hospitalization was required, the parties agreed that as of January 13, 1976 intensive care was no longer medically necessary. It was also agreed, however, that skilled nursing home facilities were mandated and that discharge of the patient — as opposed to transfer to a nursing home — would have amounted to negligence on the hospital's part.

Mrs. Cunningham testified that the failure to transfer Rempkowski was due to difficulties encountered in obtaining a Medicaid number for the patient. Although a Supplemental Security Income application was filled out on December 4, 1975, and despite hospital attempts to expedite matters, Rempkowski's Medicaid number was not received until February 19, 1976. At that time, his name had already been placed on nursing home waiting lists. Not until March 8, 1976 was Monmouth notified, by the Bayview Convalescent Center, that a bed was available. Mr. Rempkowski was transferred the following day.

By report dated October 28, 1976, the hearing examiner recommended in all three cases that the hospital be fully reimbursed for the period denied by Prudential. In each case he found that Monmouth had acted in good faith and that "special circumstances" had prevented the discharge or transfer of the patient.

The Director of the Division, relying upon sections 202 and 202.9 of the Hospital Services Manual, *see N. J. A. C.* 10:52–1.2(b), 10:52–1.3(a)(18), modified the Hearing Officer's determinations. Those sections provide in part:

202. NON-COVERED INPATIENT HOSPITAL SERVICES
Benefits are not payable for any services rendered or items dispensed or furnished in connection with:

202.9 *Services Rendered After Day Medically Necessary*
Inpatient hospital services rendered after the day it is medically
necessary, except when *special circumstances* prevent the discharge
or transfer of the patient.
NOTE: The Contractors may reimburse a hospital up to 12 calendar
days following the period established as being medically necessary
if special circumstances (social necessity) prevent the discharge or
transfer of the patient to his/her home or sheltered boarding home
and the hospital has taken effective action to stimulate placement
of the patient.
＊　　　 ＊　　　 ＊　　　 ＊　　　 ＊　　　 ＊　　　 ＊　　　 ＊
Payment for Special Circumstances (Social Necessity) is specifically
precluded for:
   a. *Patients awaiting placement in a Skilled Nursing Facility or
      Intermediate Care Facility.*
   b. Patients for whom a claim has been denied for lack of medical
      necessity.
   c. Patients who were not eligible recipients as of the date of
      admission.

                                       [emphasis supplied]

Pursuant to the above regulation, the Director denied re-
imbursement for services rendered during periods in which
a patient was retained due to unavailability of beds in lesser
care facilities. He concluded, however, that "special circum-
stances" did exist for periods during which discharge was not
forthcoming because of agency delay regarding the furnish-
ing of patients with Medicaid numbers. Hence, reimburse-
ment was allowed for such circumstances.

Accordingly, the Director made the following rulings. With
regard to Luther Townsend, he denied payment for the entire
period in question. The Hearing Officer's recommendation as
to Madeline Papikas was modified so as to provide payment
only up to and including December 5, 1974 — the day on
which Medicaid eligibility had been established.[7] Reimburse-
ment with respect to Rempkowski was limited to services
rendered before February 20, 1976, the date on which his

---

[7]The Appellate Division stated that reimbursement was rejected
beginning September 1, 1975. *Monmouth Medical Center v. State,*
158 *N. J. Super.* 241, 246 (App. Div. 1978). In this respect it was
mistaken.

Medicaid number arrived. The Director thus denied the hospital's claim for reimbursement in all three cases for services rendered while the patients were "awaiting nursing home placement."

On March 8, 1977 Monmouth filed with the Appellate Division an appeal from those portions of the Director's decision which denied reimbursement. Named as defendants were the State, Commissioner Ann Klein, and Director Gerald J. Reilly (since replaced by Acting Director Thomas A. Russo). Monmouth also challenged the adequacy of the review procedure.

The Appellate Division, in a unanimous opinion by Judge Matthews, reversed the Director's determination. *Monmouth Medical Center v. State*, 158 *N. J. Super.* 241 (App. Div. 1978). It held that the Director had impermissibly conditioned reimbursement upon the type of facility in which care was provided rather than upon the necessity for the services rendered. *Id.* at 247. The appellate judges ruled that by foreclosing the Director's discretion to grant reimbursement where placement in a lesser care facility was not possible, the regulation conflicted with the Federal Act. *Id.* at 249, 254. Accordingly, the court ordered that Monmouth be reimbursed in full for all services provided to the three patients. Finally, the Appellate Division rejected Monmouth's claim that a hearing was required before reimbursement could be denied, instead holding that a post-denial fair hearing was constitutionally adequate.

On July 11, 1978 we granted the State's petition for certification. 77 *N. J.* 506 (1978). Monmouth, pursuant to *R.* 2:3–4, filed a cross-appeal as of right with respect to the issue of procedural due process. We now affirm.

I

The parties' contentions with respect to the alleged conflict between the State regulation and the Federal Medicaid Act may be briefly summarized. Monmouth notes that the goal of the Act, set forth in its preamble, is to furnish

medical assistance to those who cannot afford the costs of "necessary" medical treatment. *See* 42 *U. S. C. A.* § 1396. The hospital further emphasizes that 42 *C. F. R.* § 440.230 (b) (1978) requires State plans to provide services "sufficient in amount, duration and scope to reasonably achieve [their] purpose," and thus in its view mandates that the State reimburse hospitals for any services rendered which are "reasonable and necessary for a particular patient's health." Therefore, it argues, where an eligible patient can neither be released nor placed in a suitable lesser care facility, the hospital must continue to treat him and is entitled to reimbursement therefor.

The State, on the other hand, denies that it must reimburse hospitals for all expenses required in treating an individual patient. Rather, it contends that as long as the needs of the Medicaid population *as a whole* are reasonably met, states are given great flexibility in tailoring their plans to suit their particular financial capabilities. The State emphasizes that the preamble, cited by Monmouth, requires the provision of assistance only insofar as is practicable under the conditions extant in the particular state. Moreover, it asserts that 42 *C. F. R.* § 440.230(b) (1978), also relied upon by the hospital, mandates only that limitations upon the scope and duration of services be reasonable as measured by Medicaid patients as a group. The instant regulation is defended as saving the State substantial monetary sums and discouraging misutilization of hospital facilities.

Courts in other jurisdictions have divided upon the issue of whether a state must provide reimbursement for all medically necessary inpatient services provided each individual patient. *Compare Rush v. Parham,* 440 *F. Supp.* 383 (N. D. Ga. 1977) *with Virginia Hospital Ass'n v. Kenley,* 427 *F. Supp.* 781 (E. D. Va. 1977). We, however, find it unnecessary to join that particular fray inasmuch as we conclude that the State regulation here at issue is unreasonable and hence invalid even under the State's interpretation of federal requirements.

In order to assess the validity of the regulation, it is necessary to understand certain aspects of the State system of Medicaid reimbursement. Hospitals contract with the State to provide medical services to the indigent. Under this agreement, hospitals which have provided such services to Medicaid eligible patients may file for reimbursement from the State. Reimbursement is at a flat *per diem* rate irrespective of the level of care rendered or the actual costs incurred. The State also reimburses skilled nursing homes and intermediate care facilities for reasonable expenditures made with respect to Medicaid recipients. Inasmuch as such facilities render less intensive services than do hospitals, however, their *per diem* reimbursement rate is considerably lower.

Due to the significant gap between hospital reimbursement rates and those received by less intensive care centers, the State has a substantial interest in encouraging use of the least expensive care facility medically practicable. Consequently, it has designed its reimbursement system so as to provide contracting hospitals with a strong disincentive to retaining Medicaid patients beyond the time when such intensive care is medically necessary.

We do not quarrel with the State's goal. Saving tax dollars and preventing misutilization of facilities are commendable aims. The instant regulation, however, paints with too broad a brush. It denies reimbursement not only to those hospitals which fail to use due diligence in placing patients in lesser care facilities, but also to those who, through no fault of their own, cannot find an opening in a suitable facility. In the latter case the hospital is penalized not because of its own laxity but, rather, solely because of circumstances beyond its control. *See Commonwealth Dept. of Pub. Welfare v. Temple U.,* 21 *Pa. Cmwlth.* 162, 343 *A.* 2d 701 (Pa. Cmwlth. 1975).[8]

---

[8]In this respect we note that the Director does allow reimbursement when the reason why the patient could not be placed was the

We do not dispute the propriety of requiring the hospital to bear the burden of clearly demonstrating that it took all reasonable steps possible to place its patient. Nevertheless, in order not to transcend the Federal Act, the Division must exercise discretion so as to allow reimbursement where medically necessary care has been rendered to an unavoidably retained patient.

We realize that our holding does result in the State and federal governments being required to pay for the overutilization — as opposed to misutilization — of facilities. That is, the State will have to provide reimbursement at a higher rate for patients who are being retained in more intensive care centers than is medically necessary. The federal government will, in turn, be compelled to increase the amount which it expends in recompensing the State for half of its Medicaid expenses.[9] Although this consideration is not to be taken lightly, we conclude that for several reasons it is not controlling here.

First, we note that the obvious equitable solution would be to reimburse hospitals in such circumstances at a rate commensurate with that of the lesser care facility which could provide the needed services. Indeed, at oral argument the State admitted that it had requested HEW approval for such a repayment scheme. Inasmuch as states are permitted to reimburse participating hospitals at the reasonable — as op-

---

fault of a social welfare agency. Other courts have deemed such situations to be analogous to that where external conditions — such as lack of beds — prevented placement. *See St. Christopher's Hosp. for Children v. Commonwealth, Dept. of Pub. Welf.*, 30 *Pa. Cmwlth.* 88, 372 *A.* 2d 504 (Pa. Cmwlth. 1977).

[9]Our dissenting colleague intimates that the Secretary of HEW might decide not to reimburse the State for its share of expenses incurred in implementing this decision. Even assuming that HEW can refuse payment for expenses found to be mandated by the federal act, we were informed at oral argument that the regional office of HEW has already agreed to pay its half of any required costs. Thus, the burden of complying with this opinion will be equally shared by State and federal governments.

posed to the actual — cost of services rendered, we see no reason why the proposed plan cannot be implemented. *See, e. g.,* 42 *U. S. C.* § 1396a(a) (13) (D) ; 42 *C. F. R.* 447. 261 (a) (1978) ; *Massachusetts Gen'l Hosp. v. Weiner,* 569 *F.* 2d 1156 (1st Cir. 1978).

Further, the main obstacle to placing Medicaid patients is the critical statewide shortage of Medicaid-available beds in skilled care facilities. The State, however, is not powerless to alleviate that condition. It can both facilitate the construction of new health centers — as well as the expansion of existing institutions — and may encourage such facilities to make a greater number of spaces available to Medicaid recipients.[10] The State's failure to remedy the nursing home shortage cannot now be used to justify penalizing hospitals which exercise due diligence in placing their patients.

In addition to the above considerations, we cannot ignore the real impact upon the public of denying reimbursement. To the extent that a hospital is not recompensed for services rendered, it will have to absorb the costs itself.[11] This in turn will compel the hospital to pass on these unreimbursed costs to the non-indigent persons who utilize its faciilties. Thus, the costs of providing for the indigent will be borne solely by those unfortunate enough to require hospital care, rather than being spread among State and national taxpayers. In our opinion, it is more just and equitable to spread the costs.

Finally, even absent the considerations explicated above, we are not convinced that the regulation at issue adequately

[10]We note that our Appellate Division has recently held that the Commissioner of Health may, as a condition of licensure, require Medicaid-eligible health care facilities to allocate a "reasonable number" of beds to the care of indigents. *New Jersey Ass'n of Health Care Facilities v. Finley,* 168 *N. J. Super.* 152 (App. Div. 1979).

[11]It is true that the hospital may attempt to recoup such expenditures from the indigents to whom the services were provided. However, inasmuch as such people are, by definition, poor, the hospital is unlikely to recover any considerable amounts.

provides for the needs of the Medicaid population as a whole. Given the widespread unavailability of skilled care beds, it is clear that reimbursement will be denied for a large number of medically needy indigents. Thus, this case is distinguishable from *Virginia Hosp. Ass'n v. Kenley, supra,* which upheld a 21-day limitation upon reimbursement for in-patient services provided to a particular Medicaid recipient. There the court explicitly found that the time period allowed was sufficient to fully meet the needs of 92% of all hospitalized Medicaid eligible patients. 427 *F. Supp.* at 786. Here, no such showing was made. Hence, the *Kenley* case, even assuming its validity, is of little applicability.

For the foregoing reasons, we conclude that under the circumstances presented the regulation at issue is unreasonable. Therefore, it is in clear conflict with federal requirements and invalid under the Supremacy Clause of the United States Constitution.

## II

■ Having concluded that hospitals which have diligently endeavored but, through no fault of their own, are unable to place their patients in less intensive medical care facilities are entitled to reimbursement, the question remains whether Monmouth is so entitled. That is, we must decide whether Monmouth exercised the requisite diligence in attempting to place the three patients.

Our task in this regard is made difficult by the meagerness of the record. Except as relating to the case of Luther Townsend, the evidence presented at the hearing was scanty and the hearing officer's findings phrased primarily in conclusory terms such as "good faith" and "special circumstances." Moreover, the Director, because he believed that payments were proscribed by the regulation, did not pass judgment upon the sufficiency of the hospital's efforts. Ordinarily, the appropriate action in such a case would be to remand the matter to the Division so that it could render its

assessment and hold additional hearings, if necessary. However, due to the already long period of time that has elapsed since the hearing was conducted as well as the relatively small sums involved, we will decide the issues at the present juncture.

We conclude that the hospital is entitled to be fully reimbursed. In light of the known shortage of available beds and the evidence presented, the hearing officer's conclusion that the hospital acted in good faith and that special circumstances were present is not unreasonable.

We wish to emphasize that this limited finding should not be taken as setting any standard to which hospitals may in the future comply and be *per se* entitled to reimbursement. Rather, it merely represents the limitations of appellate review. Thus, the Director is free to apply his expertise to future cases and may specify in detail the precise steps which a hospital must take in placing patients. Such regulation, if reasonable, represent a valid attempt to prevent unnecessary overutilization.

## III

Monmouth's contention that it is constitutionally entitled to a hearing *prior* to denial of reimbursement is rejected substantially for the reasons expressed by the Appellate Division. *Monmouth Medical Center v. State, supra,* 158 *N. J. Super.* at 254–256. At oral argument it appeared that the gravamen of the hospital's complaint was not truly the necessity for a pre-denial hearing, but rather the allegedly inordinate delay involved in obtaining post-denial review. This issue cannot be resolved on the basis of the record before us. We note, however, that hospitals have both a constitutional right and a statutory right under *N. J. S. A.* 30:4D–7(f) to a fair hearing within a reasonable time.

For the foregoing reasons, Monmouth is entitled to reimbursement for those periods denied by the Director. The judgment of the Appellate Division is affirmed.

SCHREIBER, J., dissenting. New Jersey's receipt of federal funds to assist it in providing medical services and care for eligible persons in hospitals and nursing home facilities depends upon the existence of a state plan which must satisfy the federal requirements and be approved by the Secretary of Health, Education and Welfare (HEW). New Jersey's plan does satisfy those requirements and has been approved by the Secretary.

The federal Medicaid statute states that federal funds will be available to assist states in furnishing medical assistance for certain eligible persons. The act provides that

[f]or the purpose of enabling each State, *as far as practicable under the conditions in such State,* to furnish (1) medical assistance * * * and (2) rehabilitation and other services * * *, there is hereby authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this subchapter. The sums made available under this section shall be used for making payments to States which have submitted, and had approved by the Secretary of Health, Education, and Welfare, State plans for medical assistance. [42 *U. S. C. A.* § 1396; emphasis supplied]

It is important to recognize that in the first instance funding for services may be fixed by the state to the extent it deems practicable. This has been construed to mean, *inter alia,* financially feasible. As one commentator recently stated:

Thus, while section 1396 establishes that one of Medicaid's objectives is to provide necessary medical services, it also reflects a congressional intent that each state have the freedom to tailor programs that are responsive to the fiscal conditions prevalent in that state. [Note, "State Restrictions on Medicaid Coverage of Medically Necessary Services," 78 *Colum. L. Rev.* 1491, 1499 (1978)]

The New Jersey Medical Assistance and Health Services Act, *N. J. S. A.* 30:4D–1 *et seq.,* was enacted to enable the State to obtain the benefits provided by the federal law. The Division of Medical Assistance and Health Services in the Department of Institutions and Agencies has been charged with implementing and administering a program of medical

assistance to do whatever is "necessary to secure for the State of New Jersey the maximum Federal participation that is available with respect to a program of medical assistance, *consistent with fiscal responsibility and within the limits of funds available for any fiscal year* * * *." *N. J. S. A.* 30:4D-7 (emphasis supplied). Authorization was granted to promulgate rules and regulations to carry out that intent, *N. J. S. A.* 30:4D-7, as well as to provide the Secretary of HEW with the State's plan, *N. J. S. A.* 30: 4D-7(a).

There is nothing in the federal law, including HEW regulations, which requires the State to pay a hospital for inpatient hospital care when those services are no longer needed. The federal act specifies the required content of a state medical assistance plan, including the "payment of the reasonable cost of inpatient services, provided under the plan * * *." 42 *U. S. C. A.* § 1396a(a)(13)(D). The Secretary's regulations in turn require that the amount and duration of each medical and remedial service provided be sufficient "to reasonably achieve its purpose." 42 *C. F. R.* § 440.230(b) (1978). This regulation does not require that the plan *must* include payment for inpatient hospital care when it is no longer needed.

Superimposed upon the care requirements are the fiscal restraints which a state may observe. Thus, a state plan which limited inpatient hospital care to a 21-day maximum period because of fiscal considerations has been upheld. *Virginia Hospital Ass'n v. Kenley,* 427 *F. Supp.* 781 (E. D. Va. 1977). The State is not required to pay for all reasonably necessary inpatient hospital services, but may limit coverage because of financial conditions. See *District of Columbia Podiatry Soc'y v. District of Columbia,* 407 *F. Supp.* 1259, 1263–1264 (D. D. C. 1975) (recognizing that fiscal considerations play a legitimate role in a state's determination of what medical services to provide).

Here, the State's reason for not reimbursing hospitals for inpatient care for those who no longer need that care is a

financial one. In an affidavit filed in these proceedings the Commissioner estimated that compliance with the majority's decision would increase the yearly expenditures by more than $37,000,000. The State might expect a reimbursement from the federal government of approximately 50% of that amount, provided that the Secretary of HEW finds the Court's modification of the current program acceptable.[1]

Although the State has proposed to amend its plan so that hospitals which may be forced to keep patients because of the unavailablity of nursing home facilities may be reimbursed at the lower rate paid to nursing homes, this amendment has not been approved by the Secretary of HEW. Such approval would appear to be necessary since the proposed scheme will result in a change in the "method and standards" for reimbursement of hospitals for inpatient services. See 42 C. F. R. § 447.261(a) (1978). See *Hospital Ass'n of New York State, Inc. v. Toia*, 73 F. R. D. 565, 567 (S. D. N. Y. 1976), vacated on other grounds 435 F. Supp. 819 (S. D. N. Y. 1977), aff'd 577 F. 2d 790 (2d Cir. 1978).

Authority to decide whether any modification of the State's plan is appropriate, particularly when the change may have a substantial fiscal impact, has been delegated by 'Congress and the State Legislature to others. The plan as approved by the Secretary of HEW and implemented by the Commissioner of the Department of Institutions and Agencies was within their respective delegated authority. See Note, *supra*, 78 *Colum. L. Rev.* at 1506, criticizing the Appellate Division decision in this case. As stated by the United States Supreme Court:

---

[1] At the oral argument the Deputy Attorney General stated that the regional office of HEW, not the Secretary, had indicated that if payment were ordered in this proceeding the federal government would share in this cost. The Secretary was not a party in these proceedings.

> [W]e must be mindful that "the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong * * *." [*New York Dept. of Soc. Services v. Dublino*, 413 *U. S.* 405, 421, 93 *S. Ct.* 2507, 2516, 37 *L. Ed.* 2d 688, 699 (1973), quoting *Red Lion Broadcasting Co. v. F. C. C.*, 395 *U. S.* 367, 381, 89 *S. Ct.* 1794, 1801, 23 *L. Ed.* 2d 371, 384 (1969)]

I would reverse and enter judgment for the State.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN, CLIFFORD and HANDLER —6.

*For reversal*—Justice SCHREIBER—1.