MONMOUTH MEDICAL CENTER, a non-profit corporation of the State of New Jersey, etc., Plaintiff,

v.

Patricia Roberts HARRIS, in her capacity as Secretary of Health, Education and Welfare, Defendant.

POINT PLEASANT HOSPITAL, a non-profit corporation of the State of New Jersey, etc., Plaintiff,

v.

Patricia Roberts HARRIS, in her capacity as Secretary of Health, Education and Welfare, Defendant.

Civ. A. Nos. 78–3139, 79–580, 79–1510, 78–3149 and 79–581.

United States District Court, D. New Jersey.

May 16, 1980.

Frank R. Ciesla, Giordano, Halleran & Crahay, Middletown, N. J., for plaintiffs.

Marla Simpson, Anne Singer, Asst. U. S. Attys., Newark, N. J., for defendant.

OPINION

DEBEVOISE, District Judge.

I. *Parties, Jurisdiction and Proceedings.*

The plaintiffs in this proceeding are Monmouth Medical Center, a non-profit hospital located in Long Branch, New Jersey ("Monmouth"), and Point Pleasant Hospital, a non-profit hospital located in Point Pleasant, Ocean County, New Jersey ("Point Pleasant"), both of which are providers of medical assistance and care under the Medicare provisions (Title XVIII) of the Social Security Act, 42 U.S.C. § 1395 *et seq.* Each hospital has brought this action on behalf of itself, as a provider, and on behalf of Medicare beneficiaries who were treated in the hospital during various periods of time. The defendant in this case is Patricia Roberts Harris,[1] who, in her capacity as Secretary of Health, Education and Welfare, is responsible for reimbursement of provider hospitals for covered services rendered by the provider to beneficiaries.[2]

The case involves a dispute over the reimbursement payable to Monmouth and Point Pleasant under Part A of the Medicare program, Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.*, for the costs related to inpatient hospital stays by Medicare patients or beneficiaries. Monmouth and Point Pleasant, as providers of services under Part A, are entitled to be reimbursed on the basis of the reasonable costs incurred in providing covered inpatient hospital services. The principal issue is whether a hospital is entitled to reimbursement in a situation where a patient's hospital stay is extended solely because the hospital is unable to place the patient in another institution for care which is not covered under the Medicare Program.

Each of the named beneficiary-plaintiffs was at one time during 1975–1977 hospitalized in one of the two named institutions, and, as to each, defendant denied, at least in part, reimbursement claims submitted by the institution, on the ground that the care rendered was custodial in nature within the meaning of 42 U.S.C. § 1395y(a)(9), and,

1. Patricia Roberts Harris has replaced Joseph A. Califano as Secretary of Health, Education and Welfare of the United States.

2. On May 14, 1979 the Court ordered that five separate actions (each on behalf of one or the other of the hospitals and a member of beneficiary plaintiffs) be consolidated for all purposes under Civil Action No. 78–3139. The other actions bore Civil Nos. 78–3149, 79–580, 79–581 and 79–1510.

therefore, not covered by the Medicare Act. Pursuant to Section 1879(a), 42 U.S.C. § 1395pp(a), defendant waived the beneficiaries' liability for the non-covered care but declined to waive liability for Monmouth or Point Pleasant. Each such waiver denial was upheld on reconsideration.

Since the amount in controversy exceeded $100.00 as to each beneficiary, the hospitals were entitled to further administrative review, including, if requested, an oral hearing under 42 U.S.C. §§ 1395ff(b) and 1395pp(d). The hospitals duly requested such review, and in each instance the Secretary affirmed the waiver denials at both the Administrative Law Judge and Appeals Council levels. Accordingly, plaintiffs have exhausted their administrative remedies, as required.

Thereafter, the hospitals filed their complaints in this Court, seeking injunctive relief and reimbursement of the claims which had been denied. They alleged jurisdiction to review the Secretary's final determinations pursuant to 42 U.S.C. §§ 405(g) and 1395ff(b)(1), which are made applicable to the hospital plaintiffs by 42 U.S.C. § 1395pp(d).

Defendant Secretary moved for an order pursuant to *Fed.R.Civ.P.* 12(b)(1) and (6) dismissing the complaint or, in the alternative, for an order pursuant to *Fed.R.Civ.P.* 56 for summary judgment. Plaintiffs cross-moved for summary judgment. In view of the nature of the review of a decision of the Secretary, in essence I am being asked to affirm or reverse the decision of the Secretary in this case and, in the case of plaintiff hospitals, to grant injunctive relief, e. g. *Torphy v. Weinberger*, 384 F.Supp. 1117 (E.D.Wis.1974).

## II. *The Facts.*

### A. *The Statutory and Regulatory Scheme.*

1. *Description of the Act and Definitions*: Title XVIII of the Social Security Act was enacted by Congress in 1965 to establish the federally funded health insurance program known as "Medicare". 42 U.S.C. § 1395 *et seq*. This program, which provides federal reimbursement for medical care to the aged,[3] consists of two basic components: Part A, providing "hospital insurance" funded out of Social Security taxes, and Part B, a voluntary supplementary medical insurance program primarily covering physicians' services.

Part A is designed to provide "basic protection against the costs of hospital and related post-hospital services . . . " for individuals who are age 65 or over by providing for government payment (after payment of a deductible by the beneficiary, 42 U.S.C. § 1395(e), of the "reasonable cost" of certain defined basic services which are "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member". 42 U.S.C. § 1395(e)(a)(1). Covered services include three basic categories of medical service, as set forth in 42 U.S.C. § 1395d(a): (1) inpatient hospital services, defined in 42 U.S.C. § 1395x(b) and 42 C.F.R. § 405.116; (2) post-hospital extended care services, defined in 42 U.S.C. §§ 1395x(h) and (i) and 42 C.F.R. §§ 405.-125–405.128; and (3) home health care services, defined in 42 U.S.C. §§ 1395x(m) and (n) and 42 C.F.R. § 405.130.

In brief, extended care coverage extends to "services furnished to an inpatient of a skilled nursing facility, including nursing care, other enumerated medical services and such other services necessary to the health of the patients as are generally provided by skilled nursing facilities". 42 U.S.C. § 1395x(h). "Medical and other health services" are further defined in 42 U.S.C. § 1395x(s) and "skilled nursing facilities" are further defined in 42 U.S.C. § 1395x(j). The Secretary's regulations elaborate upon these definitions and provide specific examples of covered and non-covered services. 42 C.F.R. §§ 405.125–405.128a.

2. *Agreements between H.E.W. and Providers*: The Act delineates responsibilities for participating providers. Hospitals such as plaintiffs may participate in the

---

3. Certain disabled individuals under 65 are also covered by the program. 42 U.S.C. § 1395c(2).

Medicare program as providers and receive federal payments by filing an agreement with the Secretary. 42 U.S.C. § 1395cc. Reimbursement to providers for services rendered to Medicare beneficiaries is performed either by the Secretary or, more commonly, by certain private organizations acting as fiscal intermediaries under contract with the Secretary at the request of providers. 42 U.S.C. § 1395h. In the instant case, Prudential Insurance Company of America ("Prudential") is such a fiscal intermediary.

3. *Excluded Services*: The Act also enumerates certain specific exclusions from reimbursement, including "custodial care", 42 U.S.C. § 1395y(a)(9); the regulations indicate, in particular, that aftercare which does not meet the definition of extended care constitutes custodial care, 42 C.F.R. § 405.310(g).

When services are rendered, the Act mandates various provider and physician certifications that the covered care is or was medically necessary. 42 U.S.C. § 1395f(a).

The Secretary's regulations provide, however, with regard to the two covered levels of medical care, that "a physician may certify or recertify to the need for continued hospitalization if he finds that the patient could receive proper treatment in a skilled nursing facility but no bed is available in a particular extended care facility". 42 C.F.R. § 405.1627(a)(2). *See also* 42 U.S.C. § 1395f(a)(2)(C).

4. *Utilization Review Plans Required*: Participating providers must establish utilization review plans providing, *inter alia*, for periodic review of the "medical necessity of the services . . . [to promote] the most efficient use of available health facilities and services"; such plans must provide as well "for prompt notification to the institution, the individual, and his attending physician of any finding . . . that further stay in the institution is not medically necessary". 42 U.S.C. § 1395x(k), 42 C.F.R. § 405.1035. The decision of the providers' utilization review committee does not constitute a determination of the Secretary, but is considered along with other

evidence in arriving at coverage determinations. 42 C.F.R. § 405.706. If, however, the Secretary finds a "substantial failure" to make timely utilization review in long-stay inpatient cases, she may, in lieu of terminating the provider agreement, determine—after notice and hearing—that no payment shall be made for inpatient services to individuals beyond the twentieth day of a continuous period. 42 U.S.C. § 1395cc(d), 42 C.F.R. §§ 405.163 and 405.-167.

5. *Rights and Procedures where Non-Covered Services are Provided*: The statute sets forth the relationships and rights of beneficiaries (patients) and providers in non-coverage cases. First of all, once the provider's utilization review committee finds that further inpatient hospital or extended care services are no longer medically necessary, payment to the provider may be continued notwithstanding for a period of up to three days. 42 U.S.C. § 1395f(a)(7), 42 C.F.R. § 405.162.

a. *Waiver of Individual Liability*: Although the Act does provide for federal recovery of benefits overpaid to or on behalf of individuals in some circumstances, it specifically precludes recovery or recoupment from an individual who is "without fault" and is denied benefits on grounds, *inter alia*, that services constituted only custodial care, 42 U.S.C. § 1395gg; moreover, as regards such an individual, participating providers must agree not to seek recovery, 42 U.S.C. § 1395cc(a)(1)(B). Similarly, where the Secretary has not yet paid a claim but is considering a question of coverage, the Act provides for payment to or indemnification of an individual who neither knew nor reasonably could have known that services received constituted non-covered custodial care notwithstanding. 42 U.S.C. § 1395pp(a) and (b). The Secretary has provided such a waiver of liability as to the beneficiaries herein at issue.

b. *General Provider Payment Mechanism*: The general provider payment mechanism involves ascertaining the amount of payment which adequately reflects the "reasonable costs" of services rendered to

program beneficiaries. The payment process consists of a bifurcated scheme whereby providers receive, at least monthly, interim estimated payments with subsequent adjustments for overpayments and underpayments. Such interim payments are necessary to ensure that the providers are able to meet ongoing operating costs. 42 U.S.C. § 1395g and 1395x(v)(1)(A)(ii); 42 C.F.R. §§ 405.402(b)(1) and (2), 405.454. The Secretary makes a final determination as to the precise amount of Medicare reimbursement properly due to a provider well after the close of the provider's fiscal year based upon the "cost report" which the provider is required to file. 42 C.F.R. § 405.406(b).

c. *Waiver of Provider Liability*: With regard to individual claim coverage questions, providers may also obtain a waiver of liability—and, hence, may retain payments received—where they neither knew nor had reason to know that services rendered constituted custodial care. 42 U.S.C. § 1395pp(a). In practice, however, the Secretary will grant such a waiver less frequently to providers than to beneficiaries, since the former are more likely to have received notice in "comparable situations" and thus to be "deemed" to have knowledge. 42 U.S.C. § 1395pp(b).

d. *Presumption of Due Care*: According to the Secretary's regulations, a provider "shall, in the absence of evidence to the contrary, be presumed not to have knowledge, actual or imputed" of non-coverage; rebutting evidence could include prior notice from the intermediary in this or similar cases, notice from its own utilization review committee, failure to comply with certain presumptive criteria *unless* the provider otherwise establishes that even with compliance it could not have known, or other probative evidence on the issue of excluded services. 42 C.F.R. § 405.332(b). The criteria for according a provider the so-called "presumption of due care" involve compliance with utilization review obligations, timely billing procedures, meeting requirements for promptly notifying patients of non-coverage, proper certification and recertification procedures, and a general track record of "effectively" distinguishing

covered from excluded care. 42 C.F.R. § 405.195(b). Where the intermediary finds the presumption rebutted (by failure to meet the criteria) it must so notify the provider in writing. 42 C.F.R. § 405.195(a).

At all times relevant to the instant actions Monmouth and Point Pleasant had not been determined to have failed the presumptive criteria. Thus, the Secretary denied the waiver of liability requests due to the existence of specific rebutting evidence. 42 C.F.R. § 405.332(b).

Plaintiffs Monmouth and Point Pleasant seek to challenge these denials of waiver and the underlying coverage determinations, in their capacity as providers, pursuant to 42 U.S.C. § 1395pp(d).

### B. *The Rejected Claims.*

This action involves the claims of twenty-three patients who were admitted to Monmouth and four patients who were admitted to Point Pleasant, each requiring inpatient hospital services for which the hospitals were entitled to reimbursement from Medicare. The events that occurred in each case were very similar.

In each instance the patient was admitted to either Monmouth or Point Pleasant. For a period of time skilled medical services were administered to them such as only an acute care hospital could provide. Then, in each case, there came a time when the patient did not require the high level of services of an acute care institution.

However, at that point it was impossible to transfer the patient promptly to a lesser care institution which could have provided the required level of care, namely, the kind of care which under Title XVIII of the Social Security Act is designated "custodial care". The inability of the hospital to transfer the patient to a lesser care facility was caused by two factors—(i) the severe shortage in New Jersey of nursing homes or other institutions capable of providing the limited kinds of care these patients needed, and (ii) the extensive bureaucratic delay involved in qualifying many of these patients for Medicaid, without which a lesser care institution would be unwilling to receive them.

The lapse of time between the date when a patient no longer needed inpatient hospital services and the date when it was possible to transfer the patient to a lesser care facility ranged from a number of days to a number of months, the period from December 17, 1976 to April 11, 1977 being the longest. Usually a period of weeks was involved.

The hospital's determination of the degree of care which its patients required followed a typical pattern. After a review of a patient's hospital records, the hospital's Utilization Review Committee issued a report in which it set forth the date as of which the patient no longer needed high level medical services in an acute care institution. The report then noted the difficulties which the hospital encountered in transferring the patient to a proper after-care facility and concluded that the entire hospital stay (both before and after high level medical services were required) was justified. This conclusion was based upon the obvious fact that the hospital, having assumed responsibility for the patient when the patient needed high level care, was obligated for both medical and legal reasons to continue to provide whatever level of care was required until an alternative institution which would receive the patient could be found.

The question whether the hospitals are entitled to Medicare reimbursement for the period when the patient remains in the hospital but does not require a high level of care must be resolved in this case. It is the hospitals' position that services provided during that period are inpatient hospital services as defined in 42 U.S.C. § 1395x(b) for which payment is required under 42 U.S.C. § 1395d(a) since they are reasonable and necessary and therefore not excluded from coverage by the provisions of 42 U.S.C. § 1395y(a)(1). The Secretary, on the other hand, takes the position that the kind of care which the hospitals rendered was of a nature generally understood to be custodial and therefore it was excluded from coverage by the terms of 42 U.S.C. § 1395y(a)(9) prohibiting payments for any expenses where such expenses are for custodial care.

### III. *The Law.*

A. *Jurisdiction* : There is no dispute as to the Court's jurisdiction over the claims advanced with respect to most of the patients. An individual dissatisfied with a final decision of the Secretary is entitled to judicial review if the amount in controversy is $1000 or more, 42 U.S.C. § 1395ff(b). In a dispute such as the dispute in the present case, the hospital "shall have the same rights [to judicial review] that an individual has under section 1395ff(b)", 42 U.S.C. § 1395pp(d). The Secretary concedes that these provisions confer jurisdiction on the Court as to all of the patients where reimbursement of $1000 or more is claimed.

The individual claims of patients Dattilo, Darmstadt, Litzebauer, Skiba, Gaffey, Hennessy and Van Nest, however, amount to less than $1000 each. The Secretary contends that such claims must be dismissed for lack of jurisdiction. None of the four claims which are the subject of the actions instituted by Point Pleasant (Civil Nos. 78–3149 and 79–581) equal $1000. Three of the many claims which are the subject of one of Monmouth's actions (Civil No. 78–3139) amount to less than $1000.

The hospitals contend that when an action is instituted by a hospital on account of individual claims the claims should be aggregated, treating the hospital as a plaintiff with a claim in excess of $1000. The hospitals point to 42 C.F.R. § 405.740(f) to support their position. The regulation states, in pertinent part:

Appeals from determinations pertaining to inpatient hospital services, extended care services or post-hospital home health services *shall not ordinarily be additive for purposes of determining the amount in controversy* except, where:

(2) *The same factor is at issue in more than one claim for benefits by such individual.* (Emphasis supplied.)

This regulation, however, provides for the aggregation of claims of a single individual. It does not provide for the aggregation of claims of different individuals on whose

behalf a hospital is suing. Under 42 U.S.C. § 1395pp(d), a hospital has only those rights of review as an individual possesses, and if an individual may not obtain review of a claim a hospital may not obtain a review of such claim by simultaneously seeking review of other non-reviewable claims.

■ It is well settled that federal district courts possess only the jurisdiction which Congress has conferred upon them. *South Carolina v. Katzenbach*, 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Glidden Co. v. Zdanok*, 370 U.S. 530, 551, 82 S.Ct. 1459, 1473, 8 L.Ed.2d 671 (1962); *cf. Weinberger v. Salfi*, 422 U.S. 749, 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). Therefore, the court in *Simoncelli v. Weinberger*, 418 F.Supp. 87 (E.D.Pa.1976), held that judicial review was not available for Part B reimbursement claims pursuant to 42 U.S.C. § 1395ff which makes no provision for review of those claims. If Part B claimants have no right to judicial review at all, a monetary limit on the availability of Part A review which is rationally justified is clearly constitutional. *Rubin v. Weinberger*, 524 F.2d 497 (7th Cir. 1975); *Cf. United States v. Kras*, 409 U.S. 434, 446–47, 93 S.Ct. 631, 638–639, 34 L.Ed.2d 626 (1973); *Dandridge v. Williams*, 397 U.S. 471, 484–85, 90 S.Ct. 1153, 1161–1162, 25 L.Ed.2d 491 (1970). The Senate Report states, "the remedies provided by these review procedures shall be exclusive". S.Rep.No.404, 89th Cong., 1st Sess., 55 (1965) (U.S.Code Cong. & Admin.News, p. 1995).

■ It is well established that plaintiffs with separate and distinct claims cannot aggregate their claims in order to establish the jurisdictional amount for access to the federal courts, *Snyder v. Harris*, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 (1969). In the present case, where the hospitals are suing in the right of individual patients, the hospitals cannot aggregate these individual claims to reach the jurisdictional amount. Therefore, the two actions filed by Point Pleasant (Civil No. 79–581 on behalf of Skiba and Civil No. 78–3149 on behalf of Darmstadt, Dattilo and Litzebauer) will be dismissed for lack of jurisdiction, and those portions of the Monmouth complaints seeking to review the actions of the Secretary denying reimbursement on account of patients Gaffey, Hennessy and Van Nest shall be stricken.[4]

B. *The Custodial Care Exclusion*: It must be determined whether the remaining claims for reimbursement are barred by the language of 42 U.S.C. § 1395y(a)(9) which prohibits payments where the hospital's expenses are for "custodial care".

Were it not for that exclusion, the hospitals would have been entitled to reimbursement, even though the level of care provided the patients required a lesser degree of skill than that normally provided by an acute care institution. The Medicare statute provides benefits for "inpatient hospital services", 42 U.S.C. § 1395d(a)(1), for a length of stay which was not exceeded by any of the patients in the present case. Even when the patients no longer needed skilled medical services and required only bed and board from the hospital, they were receiving inpatient hospital services as defined by the statute, 42 U.S.C. § 1395x(b). The conditions for payment imposed by the statute, (i) physician certification of the medical necessity of inpatient services, 42 U.S.C. § 1395f(a)(3), and (ii) utilization review committee confirmation of such need, 42 U.S.C. § 1395f(a)(6) and (a)(7), were met. The basis of the physician's certification and of the committee's review was, of course, the conclusion that even though in each case the patient did not require the kind of skilled care a hospital is designed to provide, it was medically necessary to keep the patient in the hospital because there was no available institution which could provide the lower level of care the patient still needed.

*Ridgely v. Secretary of Dept. of Health, Ed. & Welf. of U. S.*, 475 F.2d 1222 (4th Cir. 1973); *Cardno v. Finch*, 311 F.Supp. 251 (E.D.La. 1970).

---

4. Applying an earlier version of 42 U.S.C. § 1395ff(b), it was held that the jurisdictional limit applied to determinations of the *amount* of a claimant's benefits but not to determinations as to a claimant's *entitlement* to benefits,

There is no question that the hospital was acting responsibly and in the best interests of its patients when it kept these patients in the hospital while it searched for a facility which would receive them and provide the necessary care.

The language of 42 U.S.C. § 1395y(a)(9), however, is precise:

(a) Notwithstanding any other provision of this subchapter, no payment may be made under part A or part B of this subchapter for any expenses incurred for items or services—

\* \* \* \* \* \*

(9) where such expenses are for custodial care.

Thus, if the services provided the patients in the present case are deemed to have been "custodial care", neither the hospital nor the patient is entitled to reimbursement, notwithstanding the general entitlement provisions reviewed above.[5]

The term "custodial care" is not defined either in the statute or the regulations. However, its meaning can be derived from the definitions of other terms describing levels of care. "Inpatient hospital services" are defined in 42 U.S.C. § 1395x(b) and 42 C.F.R. § 405.116. These services include nursing services, drugs, biologicals, supplies, appliances and equipment, and such other diagnostic or therapeutic items or services ordinarily furnished by hospitals to patients. "Extended care services" are defined in 42 U.S.C. § 1395x(h) and 42 C.F.R. § 405.125–405.128. These services include items furnished in a "skilled nursing facility", that is to say, a facility primarily engaged in providing patients (i) skilled nursing care and related services for those requiring such medical or nursing care, or (ii) rehabilitation services for the rehabilitation of injured, disabled or sick persons, 42 U.S.C. § 1395x(j).

It is reasonable to conclude that custodial care is the kind of care which does not rise to the level of care constituting inpatient hospital services or extended care services. That is the meaning which the courts have given to the term "custodial care", *Westgard v. Weinberger*, 391 F.Supp. 1011 (N.D.1975).

It is care that could be administered by a layman, without any possible harm to the health of the one in custody. That is the simple reason why payment for it is not covered in a law the purpose of which is to pay medical benefits to the aged. This view of "custodial care" is also in agreement with the definition of "custodial" as found in Webster's Third New International Dictionary (1967 ed.) i. e., "relating to or marked for guardianship or maintaining safely." Thus mere "custodial care" refers quite simply to guardianship for convenience that has *no significant relation to medical care of any type. Samuels v. Weinberger*, 379 F.Supp. 120, 123 (S.D.Ohio 1973). (Emphasis supplied.)

In the present case the hospital records in the form of physicians' certificates and utilization review committee reports establish that the patients no longer needed inpatient hospital services and that they did not require the level of care comprehended within the term "extended care services" provided in a skilled nursing facility. They needed a lesser level of care which would normally be deemed to be custodial care—care which could be provided by a conscientious layman.

Monmouth argues, with considerable persuasiveness, that under the circumstances of this case the custodial type of care provided by the hospital while awaiting transfer of a patient to a lesser care facility should not be treated as custodial care for reimbursement purposes. The hospital rea-

---

5. In the present case the Secretary has acted under the waiver of liability provisions of the statute, 42 U.S.C. § 1395pp, to release the patients from any liability for the disputed payments even if this case is resolved against the hospitals. In that eventuality the hospitals (and ultimately other payors for hospital serv- ices) will be forced to bear the burden of paying for the services rendered to these and similarly situated patients during the period after highly skilled care became unnecessary and before a lesser care facility could be located to receive them.

sons that it accepted the patient to treat medical conditions which required inpatient hospital services. Even when such services were no longer required, until an alternative facility could be located continued hospitalization was medically reasonable and necessary for the treatment of the patient. Monmouth points out that the purpose of the Medicare legislation is to insure that adequate medical care is made available to the aged, *Hultzman v. Weinberger*, 495 F.2d 1276 (3d Cir. 1974); that in consequence the Medicare Act has been given a liberal construction so as to effectuate this Congressional purpose, *Pippin v. Richardson*, 349 F.Supp. 1365 (D.C.Fla.1972); *Bohlen v. Richardson*, 345 F.Supp. 124 (E.D.Pa.1972), *aff'd*, 483 F.2d 918 (3d Cir. 1973), and that the statutory exclusions from Medicare coverage have been narrowly construed, *e. g.*, *Coe v. Secretary of Health, Education and Welfare*, 502 F.2d 1337 (4th Cir. 1974); *Whitman v. Weinberger*, 382 F.Supp. 256, 262 (E.D.Va.1974). Applying these principles, Monmouth contends that the services for which it seeks reimbursement should not be deemed to be "custodial care" within the meaning of 42 U.S.C. § 1395y(a)(9).[6]

■ Persuasive as these arguments are, an examination of the statute and the cases construing it leads me to conclude that Congress did not intend to reimburse hospitals for the period of time a patient stays in the hospital after the need for either inpatient hospital services or extended care services has ended.

The Medicare Act itself spells out the extent to which a hospital is entitled to additional reimbursement for stays which continue after the need for inpatient hospital services has ended.

One set of rules is applicable when the patient who no longer needs inpatient hospital services requires extended care services in a skilled nursing facility. When an individual medically requires skilled nursing facility care but no such placement is available, payment may nonetheless be made at the inpatient hospital services rate. 42 C.F.R. § 405.1627(a)(2). When transfer between the hospital and skilled nursing facility is not immediate, but admission to the latter follows within twenty-eight days, payment may nonetheless be made. 42 U.S.C. § 1395x(i), 42 C.F.R. § 405.120.

Another set of rules is applicable when, as in the present case, the patient who no longer needs inpatient hospital services requires a degree of care which does not rise to the level of extended care services, *i. e.*, the patient requires custodial care. In that situation the statute and regulations permit only a very limited reimbursement for the period after inpatient hospital services are no longer needed. When contemporaneous utilization review results in a finding that further inpatient hospital or post-hospital extended care services are no longer medically necessary, payment may be made only for a period of up to three days. 42 U.S.C. § 1395f(a)(7), 42 C.F.R. §§ 405.162 and 405.166. When non-coverage on grounds of the custodial care exclusion is discovered after the fact but a hospital had no reason to anticipate such a finding, payment may nonetheless be made for the period of non-coverage and for up to three days following the hospital's actual or imputed knowledge. 42 U.S.C. § 1395pp(a), 42 C.F.R. § 405.330(b)(2). These provisions appear to me to limit reimbursements which may be made under the Act and preclude Monmouth from recovering in the present case.

Burdensome as the custodial care exclusion may be to hospitals which are caught in the situation in which Monmouth finds itself, the exclusion implements Congressional policy. Although the generalized

---

**6.** Supplementing its legal argument, Monmouth describes the very heavy burden which the Secretary's ruling places upon hospitals. As a practical matter, hospitals must and should take Medicare patients. Inevitably there will come a time when some of these patients recover sufficiently so that they no longer need hospital services. They will, in many cases, require aid which they cannot obtain at home. In New Jersey it is very difficult to find facilities which will provide custodial care for such patients, and a heavy financial burden is placed upon hospitals while they care for these patients while attempting to place them in suitable facilities.

goals of medical cost containment and protection of the contributory Medicare trust fund remain important, at the root of the custodial care exclusion lies another important policy consideration:

> Indeed, it appears to this Court that the purpose of the custodial care disqualification . . . was not to disentitle old, chronically ill and basically helpless, bewildered and confused people . . . from the broad remedy which Congress intended to provide for our senior citizens. Rather, the provision was intended to stop cold-blooded and thoughtless relatives from relegating an oldster who could care for him or herself to the care of an ECF merely so that that oldster would have a place to eat, sleep or watch television.

*Ridgely v. Secretary of Health, Education and Welfare*, 345 F.Supp. 983, 993 (D.Md. 1972), aff'd, 475 F.2d 1222 (4th Cir. 1973).

That this was a purpose envisioned by Congress is further buttressed by reference to the Senate debates in 1965: Senator Abraham Ribicoff, one of the Medicare Act's principal supporters and an ex-Secretary of Health, Education and Welfare, spoke in support of the statutory language:

> The conditions set out in the legislation for the participation of extended care facilities are necessary to assure that covered services will provide high quality convalescent and rehabilitative care . . [and] to carry out the intent of the legislation to provide essentially medical, rather than custodial care in these facilities. 111 Cong.Rec. S15234 (daily ed. July 7, 1965).

Senator Albert Gore agreed:

> Custodial care is essentially a problem of financing the costs of housing, rather than a problem of financing health care costs . . . The only proper objective of the proposed health insurance programs is to provide coverage of medically necessary care that will cure and rehabili-

tate the patient. 111 Cong.Rec. S15234 (daily ed. July 7, 1965).

In light of these concerns, the Secretary has reasonably interpreted custodial care basically as involving services which do not rise to the level of the statutorily-defined extended care or skilled nursing services. 42 C.F.R. § 405.310(g).

Monmouth cited a number of cases which it asserted supported the proposition that a hospital must be reimbursed for custodial services rendered by it which are reasonable and necessary during the period a patient is awaiting transfer to a custodial care facility. None of the cases which Monmouth cites so holds.

For example, in *Hultzman v. Weinberger*, 495 F.2d 1276 (3d Cir. 1974), the Secretary denied reimbursement for inpatient hospital services on the grounds that they were not reasonable and necessary and therefore specifically excluded from coverage by § 1395y(a)(1). The Court noted that the custodial care exclusion was not the basis of the Secretary's determination and ruled that there was nothing in the record to support a conclusion that the services were not reasonable and necessary. It rejected the Secretary's argument that the services were not reimbursable to the hospital because they were the kinds of services which could have been provided by an extended care facility (which could have obtained reimbursement under the Act). Rejecting the cases cited by the Secretary, the Court stated that they were "inapposite because they all involve the question of whether services rendered were essentially supportive or custodial in nature and hence excludable under section 1395y(a)(9)". 495 F.2d at 1282.[7]

Other cases cited by Monmouth involved the situation in which the plaintiff-beneficiary needed and received *covered* skilled nursing services while in the hospital, and therefore the Court declined to find the

---

**7.** The *Hultzman* case, like most of the other cases cited by Monmouth, involved suits by patients for payment of their medical bills. They were not suits by the hospitals which rendered the services. The 1972 amendments

to the Medicare Act provide for a waiver of the patient's liability, as in the present case, and therefore the institution is more likely to be the plaintiff seeking to compel reimbursement.

care was not covered merely because an institution (which could have obtained reimbursement) other than the hospital rendered the services, *e. g., Torphy v. Weinberger, supra,* 384 F.Supp. 1117 (E.D.Wis.1974); *Hayner v. Weinberger,* 382 F.Supp. 762 (E.D.N.Y.1974). In those cases the courts were required to choose between the Secretary's contention that the beneficiaries themselves should pay for all services—even if the services would have been covered in skilled nursing facilities—rendered after the date when acute hospital services became no longer required, and the beneficiaries' contention that they could not have known or anticipated when this event would occur and should not be financially penalized for receiving a *covered* level of care in the wrong type of institution.[8]

■ In the present case, however, the hospitals are not seeking reimbursement for skilled care, that is to say, for a covered level of services. They are seeking reimbursement for custodial care, a non-covered level of services. The cases which Monmouth cites recognized that if custodial services had been involved there would have been no basis for reimbursement:

> However, if, as was found by the ALJ, the care given the Patient after July 5th was 'custodial care,' it would be excluded from coverage under the Act even if it were rendered in an extended care facility. 42 U.S.C.A. § 1395y(a)(9).

*Hayner v. Weinberger, supra,* 382 F.Supp. at 766.

I have concluded, therefore, that the Secretary correctly interpreted the Act as applied to the facts of the present case. There remain for consideration, however, the various arguments which Monmouth advanced to support its contention that the Act may not lawfully be given such an interpretation.[9]

■ C. *Equal Protection of the Laws*: Monmouth contends that in view of the severe shortage of nursing home beds in New Jersey the Secretary's refusal to pay for custodial care rendered in hospitals while a patient is waiting to be transferred to a nursing home results in unlawful discrimination against New Jersey patients. In other parts of the country, the argument goes, where there is no such shortage, patients can move from a hospital to a nursing home as soon as their condition permits, and thus avoid the heavy hospital expenses which a New Jersey Medicare patient incurs while the hospital searches for a lesser care facility.

It should be obvious that social legislation applicable throughout the country will have a differing impact in various parts of the country, reflecting different conditions and programs in effect in each state. Certainly Congress is not required to tailor such legislation to compensate for these different conditions and to insure that every beneficiary of the legislation is benefitted to precisely the same extent. That would be an impossible task.

> Particularly when we deal with a withholding of a noncontractual benefit under a social welfare program such as [Social Security], we must recognize that the Due Process Clause can be thought to interpose a bar only if the statute manifests a patently arbitrary classification, utterly lacking in rational justification.

---

8. For an analogous situation under the Federal Medicaid Act, 42 U.S.C. § 1396 *et seq., see Monmouth Medical Center v. State,* 80 N.J. 299, 403 A.2d 487 (1979).

9. This case has been briefed and argued on the assumption that during the period after the date when Monmouth's patients no longer needed inpatient hospital services the level of care which they required was such as would be deemed custodial care, that is to say, after the need for hospital care ended, they did not require extended care services in a skilled nursing facility. An examination of the medical records of the patients suggests that in some instances the care which was given to the patients might be deemed to be care requiring post-hospital extended care services reimbursable under the Medicare Act. It is possible that with respect to those patients Monmouth is entitled to reimbursement under the rules established in *Hultzman v. Weinberger,* 495 F.2d 1276 (3d Cir. 1974), and similar cases. If Monmouth wishes to amend any of its complaints to advance that claim with respect to appropriate patients, it may move for leave to do so.

*Flemming v. Nestor*, 363 U.S. 603, 611, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960).

Medicare is a basic hospital coverage plan, not a comprehensive health insurance plan. Mere limits in coverage in social welfare programs do not call constitutional remedies to bear: "A legislature may address a problem 'one step at a time,' or even 'select one phase of a field and apply a remedy there, neglecting the other.' " *Jefferson v. Hackney*, 406 U.S. 535, 546, 92 S.Ct. 1724, 1731, 32 L.Ed.2d 285 (1972), *citing Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955).

Since the custodial care exclusion resulted not only from a statutory scheme which was not comprehensive in scope but also from a rational legislative goal related to the welfare of the individuals covered thereunder, the exclusion clearly comports with due process. "If the goals sought are legitimate, and the classification adopted is rationally related to the achievement of those goals, then the action of Congress is not so arbitrary as to violate the Due Process Clause." *Richardson v. Belcher*, 404 U.S. 78, 84, 92 S.Ct. 254, 258, 30 L.Ed.2d 231 (1971).

Neither the custodial care exclusion nor its impact upon New Jersey Medicare patients is arbitrary or involves invidious discrimination. Neither Monmouth nor its patients has been deprived of constitutional rights.

█ D. *The Secretary's Rejection of the Utilization Review Committee's Conclusions*: The Medicare Act provides, in 42 U.S.C. § 1395f, that where a patient has received inpatient services for a certain length of time his expenses will not be covered unless a physician certifies that such services are medically necessary. In addition, payment is conditional upon periodic review by the provider's Utilization Review Committee as to the medical necessity of further inpatient hospital services. 42 U.S.C. § 1395f(a)(6) and (a)(7). A decision by a provider's Utilization Review Committee as to the medical necessity of care should be given substantial weight by the Secretary, *e. g., Hultzman v. Weinberger, supra.*

In the present case Monmouth argues that its Utilization Review Committee found with respect to each patient that his or her stay beyond the period when high level care was needed was medically justified, and that the Secretary's rejection of that conclusion was arbitrary, capricious and unreasonable.

In reality, that was not the actual finding of the Utilization Review Committee. What the Committee found, in each case, was that the patient no longer required high level medical services in an acute care institution. The Committee then concluded that notwithstanding such finding, continued stay in the hospital was "justified" because of "difficulties encountered in making a proper placement", or "the shortage of nursing home beds in Monmouth County", or the conditions noted in "the enclosed Social Service notes", etc.

Monmouth cannot use such reports to bootstrap non-covered services into covered services. The Secretary was entitled to look through the reports to their substance and to base her final determination upon the statutory provisions governing covered and non-covered services.

Monmouth's concept that benefits somehow *vest* once a Utilization Review Committee determines that Medicare should pay the bill was derived from a case, *Himmler v. Weinberger*, 422 F.Supp. 196 (E.D.Mich., 1976), which the Sixth Circuit rejected, *sub nom., Himmler v. Califano*, Medicare and Medicaid Guide (CCH) ¶ 20116, at 9836 (December 11, 1979):

Under Section 1395x(k)(4), the utilization review committee is to consult with the attending physician before making any finding that a further stay in the institution is not medically necessary. That section also requires that the institution, individual and attending physician shall be given prompt notification of any such adverse finding. Section 1395f(a)(7) further provides that if there is a finding that extended care services are not medically necessary, payment may be made

for those services up to the fourth day after the day on which the hospital or skilled nursing facility received notice of such finding. Therefore, *while not ascribing finality to the decision of the utilization review committee*, the regulations and statute, by protecting the coverage of the patient for at least four days after the decision has been made and by providing for a consultation between the attending physician and the committee in case of such decision, provide for at least a limited protection from the risk that a patient will be forced either to leave the extended care facility or to assume personal financial responsibility for continued treatment there at that time. (Emphasis supplied.)

E. *Failure to Provide Hearing*: Monmouth asserts that hospitals and patients are deprived of procedural due process of law by reason of retroactive determinations of non-reimbursement and the termination of benefits without prior notice and hearing. For example, in the case of patient Eleanor Blue, who was at Monmouth from May 12, 1977 until June 27, 1977, it was not until August 4, 1977 that the intermediary, Prudential Insurance Company of America, acting on behalf of the Secretary, notified Monmouth and the patient that it was denying reimbursement for services rendered from May 25, 1977 through June 27, 1977. Significantly, that determination (which, of course, was subject to review through the statutory and regulatory appeal procedures) did not have the effect of terminating the patient's hospitalization. It simply put in issue the question of who was going to pay for the hospitalization.

 There is set forth above in the Statement of Facts a description of the procedures which must be followed when a hospital provides or is about to provide non-covered services. It is Monmouth's contention that before a hospital patient can be deemed to have been shifted from a covered to a non-covered status, the patient must be given some form of pre-determination hearing. Quite frankly, if such a requirement were imposed, I do not know how it would

be possible to administer the Act, *see* concurring opinion in *Town Court Nursing Ctr., Inc. v. Beal*, 586 F.2d 280 (3d Cir. 1978).

To support its position, Monmouth relies heavily upon *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) (pre-determination hearing required before termination of welfare benefits); *Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (pre-dismissal hearing required before dismissal of public school students); and *Klein v. Califano*, 586 F.2d 250 (3d Cir. 1978) (residents of nursing home receiving Medicaid reimbursement entitled to opportunity to be heard prior to decertification of nursing home and transfer of patients).

 Assuming that Monmouth has standing to raise the issue of lack of a pre-determination hearing (the patients in this case being protected from paying anything for the disallowed services by the Secretary's indemnification), an analysis of the pertinent factors as suggested in *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976) leads to the conclusion that the procedures for determining and reviewing reimbursement entitlement under the Medicare Act and regulations satisfy due process requirements. These factors are: (i) the degree of potential deprivation that may be created by a particular decision; (ii) the fairness and reliability of the existing pre-determination procedures, and the probable value, if any, of additional procedural safeguards; and (iii) the public interest.

A patient whose hospital stay is determined not to be covered by Medicare is not thereby thrown out of the hospital. At worst, such a patient becomes liable to pay the hospital bills unless some other source of payment is available or unless the determination is reversed on review. Thus, the consequences of the determination to the patient are less onerous than those which were involved even in *Mathews v. Eldridge, supra* (the loss of disability benefits), and bear no comparison with the loss of welfare benefits upon which a recipient depended as a means to live, which were the subject of

the *Goldberg* case, or the immediate transfer of a Medicaid patient to a nursing home not selected by the patient, *Klein v. Califano*, 586 F.2d at 250 (3d Cir. 1978).

Turning to the fairness and reliability of the existing pre-determination procedures, it is the patient's own physician and the hospital's own Utilization Review Committee who make the initial evaluation as to the patient's needs. Only at a later date does the intermediary make a determination as to the hospital's eligibility for reimbursement. At that time the services will have been provided, and the question becomes who pays for the services. There are procedures available to review the intermediary's determination. To introduce an additional hearing requirement which would come into play during the course of a patient's hospital stay seems utterly impractical and unnecessary, *cf., Town Court Nursing Ctr., Inc. v. Beal, supra*, 586 F.2d 266 (3d Cir. 1978).

The public has an interest both in providing covered hospital services to elderly persons and also in effective and economical administration of the system. The procedures which Monmouth advocates would, in all probability, result in the utilization of resources and the creation of administrative problems which would impede the realization of both these objectives.

Due process contentions almost identical to Monmouth's were analyzed carefully in *Himmler v. Califano*, 611 F.2d 137 (6th Cir. 1979). The Court concluded that the statutory and regulatory scheme for hearing and determination of questions of Medicare coverage were not violative of the Due Process Clause of the Fourteenth Amendment. I believe that result is sound and therefore hold that the procedures followed in the present case did not violate constitutional rights either of Monmouth or of its patients.

### Conclusion

For the reasons set forth above, I conclude that the Secretary employed the correct legal standards in arriving at her determination and that there exists substan-

tial evidence in the record to support her findings.

An order will be entered dismissing Civil Actions Nos. 78–3149 and 79–581 and those portions of the Monmouth complaints on behalf of patients Gaffey, Hennessy and Van Nest for lack of subject matter jurisdiction. The order will affirm the various other decisions of the Secretary.